## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 31 2015, 10:04 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEYS FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| James A. Piatt | Steven C. Shockley |
| Joseph N. Williams | Blake J. Burgan |
| Price Waicukauski & Riley, LLC | Taft Stettinius & Hollister, LLP |
| Indianapolis, Indiana | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jeffrey E. Duermit, | December 31, 2015 |
| *Appellant-Defendant,* | Court of Appeals Case No. 29A02-1503-PL-146 |
| v. | Appeal from the Hamilton Superior Court |
| Odyssey Healthcare, Inc., | The Honorable Steven R. Nation, Judge |
| *Appellee-Plaintiff.* | Cause No. 29D01-1408-PL-7983 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Jeffrey E. Duermit (Duermit), appeals the trial court's issuance of a preliminary injunction enforcing the terms of a non-competition agreement in favor of Appellee-Plaintiff, Odyssey Healthcare, Inc. (Odyssey).[1]

We affirm. [2]

## ISSUE

Duermit raises four issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court abused its discretion by granting a preliminary injunction.

## FACTS AND PROCEDURAL HISTORY

Odyssey, a Delaware corporation with its principal place of business in Texas, "provides end-of-life care services." (Appellant's App. p. 22). As "one of the largest hospice care providers in the United States[,]" Odyssey conducts business in Indiana and maintains offices in several Indiana cities. (Appellant's App. p. 22). The success of Odyssey's business heavily depends on developing and maintaining relationships with potential referral sources—*i.e.*, "hospitals, physicians, assisted living locations, long-term care facilities," etc.—which have

---

[1] Odyssey is a subsidiary of Gentiva Health Services, Inc. and conducts business in Indiana as Gentiva Hospice. Throughout these proceedings, the parties have referred to Odyssey and Gentiva interchangeably. In order to avoid confusion, we refer to the Appellee solely as "Odyssey."

[2] An oral argument was held in this case on December 8, 2015, at the Indiana Court of Appeals courtroom in Indianapolis, Indiana. We commend the attorneys for their excellent advocacy.

the potential to refer patients who need hospice services. (Transcript p. 22). In 2010, Odyssey hired Duermit as the executive director of its Indianapolis and Avon offices. His duties entailed overseeing the day-to-day operations, financial operations, and the hiring and recruiting of employees. Duermit was also tasked with establishing relationships with referral sources.

[5] On May 27, 2010, as "a requirement of his . . . employment[,]" Duermit entered into a Nonsolicitation and Nondisclosure Agreement (Non-Compete Agreement) with Odyssey. (Appellant's App. p. 185). Under the Non-Compete Agreement, Duermit agreed that

> for a period of twelve (12) months following [his] termination of employment, whether such termination is by [Duermit] or Odyssey, voluntary or involuntary, with or without cause, for any reason or no reason . . . , [Duermit] shall not, directly or indirectly, engage or participate, attempt to engage or participate, or assist any person with engaging or participating . . . , in any act which constitutes:
> (a)   soliciting, encouraging, convincing, assisting, or otherwise facilitating or causing any person who was an Odyssey patient, customer, referral source or supplier at any time during the twelve (12) months preceding the termination of [Duermit's] employment to:  eliminate, reduce, or otherwise affect the business that they transact or may transact with Odyssey;
> (b)   entering into any employment, contractual, partnership, corporate, consulting, or other business relationship or transaction of any kind with any person who was an Odyssey competitor at any time during the twelve (12) months preceding the termination of [Duermit's] employment with Odyssey;
> (c)   soliciting, encouraging, convincing, or otherwise assisting any person who was an employee, consultant or contractor of Odyssey during the twelve (12) months preceding the termination

of [Duermit's] employment with Odyssey to compete with Odyssey, to perform services for or on behalf of any competitor of Odyssey, to stop performing services for or on behalf of Odyssey, to change or otherwise affect the quality or quantity of their services to or on behalf of Odyssey, or to change the cost, price, or any other term or condition of such services; or

(d)     engaging in any business or other activity, whether as an owner, manager, partner, employee, contractor, agent or other capacity, which is competitive with Odyssey's within a fifty (50) mile radius of any Odyssey location at which [Duermit] was employed, or over which [Duermit] had management or other responsibility for (regardless of whether [Duermit] was physically located at said location), during the twelve (12) month period preceding the termination of [Duermit's] employment from Odyssey.

(Appellant's App. p. 185).

[6]     Additionally, pursuant to the Non-Compete Agreement, Duermit "acknowledge[d] and agree[d] that, as a direct result of his . . . employment by Odyssey, [he] [would] have access to, learn about, and become familiar with, trade secrets of Odyssey and other confidential and proprietary information belonging to Odyssey or relating to its business."  (Appellant's App. p. 185). The Non-Compete Agreement defined "Proprietary Information" as:

without limitation, all costs, expenses, revenue, income, and other financial information and reports relating to Odyssey, its patients, clients, suppliers and/or referral sources, any lists, files, or other non-public business information relating to current or potential patients, customers, referral sources, suppliers, contact persons, or personnel, as well as[] any research, data, analysis, concepts, strategies, plans, methods, training materials, policies, and procedures developed, acquired, refined or otherwise utilized

by Odyssey in carrying out its business and which has not been publicly disclosed by Odyssey and is not readily ascertainable by proper means.

(Appellant's App. p. 185). Regarding Proprietary Information, Duermit agreed that he would not

at any time, directly or indirectly, disclose, attempt or threaten to disclose, allow to be disclosed, or assist any person with obtaining, utilizing, or disclosing any Proprietary Information. Moreover, in the event of termination, [Duermit] shall (a) not remove or take Proprietary Information, or allow any of the Proprietary Information to be taken[,] from[] Odyssey's premises; (b) not reproduce or duplicate in any manner, or allow to be reproduced or duplicated, any Proprietary Information; and (c) within one (1) business day of the termination of his . . . employment by either party, or at Odyssey's request, return to Odyssey any and all Proprietary Information which is in [Duermit's] possession, custody, or control, including any original, duplicate and/or any reproduction. . . .

(Appellant's App. p. 185).

[7] On June 1, 2010, Duermit also signed a separate Confidentiality Agreement as a condition of his employment with Odyssey. Similar to the Proprietary Information provisions contained in the Non-Compete Agreement, the Confidentiality Agreement stipulated that during the course of his employment, Duermit would have access to "Certain Confidential Information of Odyssey[,]" which it defined as

all information of or relating to Odyssey which is generally not made available or disclosed to the public by Odyssey (including,

but not limited to, present or prospective marketing or community education policies or activities; patient census and admissions; present and prospective products and services; vendor prices and pricing policies; agreements and relationships between Odyssey and its employees, contractors, consultants, suppliers, patients, referral sources and third party payors; potential new business opportunities for Odyssey; cost, profit and other financial data; patient and referral lists of Odyssey; medical, personal, financial and other records of or relating to Odyssey's patients, employees, contractors, consultants, suppliers, referral sources or third party payors; company practices, policies and procedures; and information and process knowledge with respect to the manner in which Odyssey conducts its business).

(Appellant's App. p. 183). Duermit attested that "[u]pon his termination of employment with Odyssey, all material containing any Confidential Information in [his] possession or control (including copies thereof) shall be returned promptly to Odyssey without request, and shall not be reproduced, copied or retained by [him] in any fashion." (Appellant's App. p. 183). Duermit additionally agreed that he would keep all Confidential Information confidential during and after his employment. "[I]n the event of any breach or threatened breach" of Duermit's obligations under the Confidentiality Agreement, Duermit acknowledged his understanding that

Odyssey shall be irreparably harmed and damaged and accordingly, Odyssey shall, in addition to any other rights or remedies it may have hereunder, at law or in equity, be entitled to apply for and obtain a temporary restraining order without notice and temporary and permanent injunctive relief to enforce the [Confidentiality Agreement's] provisions.

(Appellant's App. p. 183).

[8] On August 1, 2013, Odyssey terminated Duermit's employment. That same day, Duermit sent an email to Mike Rehfeldt (Rehfeldt), an employee of Heart to Heart Hospice (Heart to Heart). Like Odyssey, Heart to Heart is in the business of "[p]roviding care to individuals with end of life needs" in various markets in Indiana, including the Indianapolis area. (Tr. p. 248). In the email to Rehfeldt, Duermit attached his resume and included "a brief outline of some of [his] accomplishments over the last few years." (Odyssey's Exh. 49, p. 1). Particularly, Duermit detailed the revenue goal and actual revenue, along with other financial and employee information, for the sites he managed at Odyssey. Duermit indicated that he "would appreciate the opportunity to talk to someone about the Indianapolis and surrounding market as I think I could help achieve success here." (Odyssey's Exh. 49, p. 1). In turn, Rehfeldt forwarded Duermit's resume and email containing Odyssey's financial information to Heart to Heart's president and chief operating officer, William Thurman (COO Thurman), identifying Duermit as a candidate for Heart to Heart's executive director position in Indianapolis.

[9] Prior to his departure from Odyssey, Duermit used his Odyssey email account to transmit a number of Odyssey documents to his personal email account, and he subsequently saved those documents to his home computer. The Odyssey documents that Duermit stored on his personal computer included: a 2011 Nursing Facility Services Agreement with Miller's Merry Manor—an Odyssey referral source; a 2010 One-Time Residential Services Agreement with Maple

Park Village—another Odyssey referral source; a Growth Plan Summary from 2010 that contained information about Odyssey's highest producing referral sources; a Market Overview from 2011 containing information about referral sources and an analysis on the company's strengths, weaknesses, opportunities, and threats; and numerous documents with demographic data which were compiled from an internal Odyssey database called the Mapster database, for which Odyssey had expended over $40,000 in licensing fees to create. According to Odyssey, all of the documents that Duermit saved to his personal computer are confidential and would not be shared with a competitor.

[10] On August 19, 2013, Duermit signed a Severance Agreement, pursuant to which Odyssey agreed to pay him a severance package equivalent to six weeks of his salary. The Severance Agreement stipulated that Duermit was "still bound by the terms and conditions of the [Non-Compete Agreement]." (Appellant's Confidential App. p. 222). In addition, Duermit re-affirmed his agreement "to keep confidential any proprietary information [he] may have acquired about [Odyssey's] business." (Appellant's Confidential App. p. 222).

[11] Although not directly related to the present case, at some point in 2013, Odyssey filed several lawsuits in Michigan and Texas against Heart to Heart after six former Odyssey employees began working for Heart to Heart, purportedly in violation of their non-competition agreements. In the fall of 2013, representatives from Odyssey and Heart to Heart convened and ultimately reached an oral settlement arrangement. The parties immediately began operating under the oral arrangement, which was memorialized in a

Settlement Agreement and General Release (Settlement Agreement) executed on April 4, 2014.

[12] The Settlement Agreement "set up a framework moving forward for the parties to resolve restrictive covenant [disputes] when employees of one entity move[] to the other." (Appellant's App. p. 10). In part, the Settlement Agreement provided that "[f]or a period of two (2) years from the date of execution of this [Settlement] Agreement, Odyssey and Heart [t]o Heart agree that, upon either Party's decision to hire a Principal Employee,[3] the hiring Party shall provide notice to the other Party of its intent to hire a Principal Employee." (Appellant's Conf. App. p. 538). This notice required the party seeking to hire an employee of the other to provide the name of the employee to be hired; the position into which the employee would be hired; and the office, market, or region where the employee would operate. Thereafter, "[u]pon receiving notice of a Party's intent to hire a Principal Employee, the Party receiving notice shall provide . . . a statement whether the Principal Employee is subject to a restrictive covenant and, if so, . . . a copy of any agreement(s) containing such covenant(s)." (Appellant's Conf. App. p. 539).

[13] Following his termination from Odyssey, even though Duermit had obtained employment with a non-hospice care provider, Duermit remained in contact

---

[3] The term "Principal Employee" was defined in the Settlement Agreement to consist of "salesperson[s], clinical liaison[s], executive director[s], and any managerial or executive employee[s] operating at the regional level or higher." (Appellant's Conf. App. p. 537).

with the executives at Heart to Heart regarding his potential employment. On December 20, 2013, Steve Mikuls (Mikuls), Heart to Heart's national director of operations, sent an email to COO Thurman setting forth the company's "plans for integrating and growing our newly-acquired operations in [Michigan] and [Indiana]." (Odyssey's Exh. 54, p. 1). The plan anticipated that "Duermit will come on as an [a]rea [executive director] to oversee Marion and [Indianapolis], and help us get established in Munster . . . . It will take approximately $125[,000] to get [Duermit] on board. We'll also need to be able to offer [Duermit] a bonus plan." (Odyssey's Exh. 54, p. 1). Mikuls indicated that Duermit was subject to a Non-Compete Agreement; as such, COO Thurman would need "to clear the path to bring [Duermit] . . . on by calling [Odyssey]." (Odyssey's Exh. 54, p. 2).

[14] On February 18, 2014, Heart to Heart officially extended an offer to hire Duermit as an area executive director. On February 21, 2014, pursuant to the Settlement Agreement, Heart to Heart notified Odyssey of its intent to hire Duermit. As Duermit had provided Heart to Heart with a copy of his Non-Compete Agreement, Heart to Heart acknowledged to Odyssey that Duermit "is under a twelve month non-compete with a restricted radius of [fifty] miles from any site he was managing." (Appellant's App. p. 218). Heart to Heart's notice further explained that Duermit "responded to our [advertisement] for the executive director position for our new site in Munster[,] Indiana[,] about 150 miles from the sites he managed for [Odyssey]." (Appellant's App. p. 218). Odyssey responded, "Your [sic] good to go . . . . No concerns with Jeff D."

(Appellant's App. p. 218). On March 1, 2014, Duermit began his employment at Heart to Heart.

[15] Subsequent to Duermit's hire at Heart to Heart, Duermit forwarded the Odyssey contracts with Miller's Merry Manor and Maple Park Village, which he had retained on his home computer, to three management-level employees at Heart to Heart: Michelle Newton (Newton), the regional director of operations; Gary Johnson (Johnson), the regional director of sales; and Mikuls. Duermit also provided Johnson with a 2010 population map generated from Odyssey's Mapster database in order to assist Johnson with compiling Heart to Heart's third quarter sales plan.

[16] Despite Heart to Heart's representation to Odyssey that Duermit would be working in Munster, Duermit soon began engaging in various business activities on behalf of Heart to Heart in and around the Indianapolis market. In particular, in April of 2014, Duermit informed his management team—*i.e.*, Mikuls, Johnson, and Newton—that he had secured an opportunity to give a presentation at a hospital on the west side of Indianapolis regarding hospice care. Mikuls advised him that such a "presentation would probably fall within the restrictions of your [Non-Compete Agreement] with [Odyssey]" based on the fact that he would appear to be soliciting business from Odyssey referral sources. (Odyssey's Exh. 24, p. 1). Nevertheless, Newton commended him for "getting the appointment and presentation[,]" and Mikuls proposed sending a Heart to Heart employee to present in lieu of Duermit in order "to keep [Duermit] off the radar screen." (Odyssey's Exh. 24, p. 1).

[17] The record also reveals that Duermit solicited or attempted to solicit several of Odyssey's long-time referral sources on behalf of Heart to Heart. On July 30, 2014, Duermit informed other Heart to Heart executives that he would "continue to market" Miller's Merry Manor in the Indianapolis area in order to "create an opportunity to replace [Odyssey] as secondary in the referral chain." (Odyssey's Exh. 23, p. 2). Similarly, Duermit informed his Heart to Heart managers that "we look to have another new referral in [Indianapolis]": Manor Care Prestwick. (Odyssey's Exh. 23, p. 2). Duermit stated that he would "work with [the Indianapolis] team to see where we can take this." (Odyssey's Exh. 23, p. 2). The evidence also establishes that in July of 2014, Duermit met with Odyssey's medical director, Dr. Steven Wright (Dr. Wright)—who is also a referral source for Odyssey—in an effort to entice him to work for Heart to Heart. After learning that Duermit had met with Dr. Wright on behalf of Heart to Heart, Odyssey had to increase Dr. Wright's "contract reimbursement for services that he performs as a way to remedy the situation and his concerns." (Tr. p. 86).

[18] Furthermore, shortly after Duermit began working for Heart to Heart, three Odyssey employees who had worked with Duermit at the Indianapolis and Avon facilities communicated with Duermit about employment opportunities at Heart to Heart: Robin Lightfoot (Lightfoot), Odyssey's director of clinical services; Leslie Patterson (Patterson), Odyssey's nurse case manager; and Jenny Davenport (Davenport), Odyssey's admissions coordinator. Thereafter, Duermit advocated for the employment of these individuals with his Heart to

Heart management team. He also discussed possible salaries, benefits, and other positive attributes of Heart to Heart with the candidates in an apparent effort to persuade them to leave their employment with Odyssey. Despite Odyssey's efforts to negotiate and counter-offer to retain these employees, between May and July of 2014, Lightfoot, Patterson, and Davenport all resigned from Odyssey to commence working for Heart to Heart. Odyssey explained that due to the simultaneous vacancy of three "key positions," its "resources have certainly been spread thin to cover their duties." (Tr. p. 54). Odyssey also described that the "effort, manpower, [and] cost [that] it's taken to recruit and fill those positions and then also to . . . train them to really be of quality" has been "very strenuous." (Tr. p. 54).

[19] On August 14, 2014, Odyssey filed a Complaint against Duermit, alleging, in pertinent part, that Duermit violated the restrictive covenants of his Non-Compete Agreement. In particular, Odyssey claimed that Duermit solicited Odyssey patients, customers, referral sources, and suppliers; he solicited other Odyssey employees to work in competition with Odyssey; he became employed by Heart to Heart in a competitive capacity; and he engaged in competitive business within fifty miles of the Odyssey locations where he was employed or over which he had management responsibility. In addition, Odyssey accused Duermit of using or disclosing Odyssey's confidential, proprietary, and/or trade secret information in violation of both his Non-Compete Agreement and the Indiana Uniform Trade Secrets Act. As a result, Odyssey sought injunctive relief, as well as actual damages, punitive damages, and attorney fees. In

conjunction with its Complaint, Odyssey filed a specific Motion for Preliminary Injunction to enjoin Duermit from violating his obligations under the Non-Compete Agreement and from using or disclosing Odyssey's trade secrets and confidential information.

[20] On September 16, 2014, the trial court conducted a hearing on Odyssey's Motion for Preliminary Injunction. On February 13, 2015, the trial court issued its Findings of Fact, Conclusions of Law, and Judgment granting the preliminary injunction. In particular, the trial court concluded that Odyssey "established a reasonable likelihood of success on the merits of its claims for breach of the Non-Compete [A]greement and violation of the Trade Secrets Act." (Appellant's App. p. 19). The trial court further determined that Odyssey "has suffered irreparable harm and its remedies at law are inadequate. . . . The harm [Odyssey] would suffer if a preliminary injunction were denied exceeds the harm Duermit would suffer if it were granted[,] [and] [t]he issuance of the requested injunction does not disserve the public interest." (Appellant's App. pp. 19-20) (internal citations omitted).

[21] Accordingly, the trial court ordered that Duermit be "enjoined for a period of 164 days from the date of this Order from directly or indirectly[] engaging or participating, attempt[ing] to engage or participate, or assisting any person with engaging or participating . . . in any act which constitutes[:]" (1) soliciting Odyssey's patients, customers, referral sources, or suppliers to "eliminate, reduce, or otherwise affect the business that they transact or may transact with [Odyssey]"; (2) soliciting Odyssey's employees, consultants, and contractors to

either perform services for an Odyssey competitor or to cease performing services on behalf of Odyssey; and (3) engaging in any business or other activity which is competitive with Odyssey's within a fifty-mile radius of any Odyssey location where Duermit was employed or over which he had management or other responsibilities within the twelve months preceding his termination. (Appellant's App. pp. 20-21).[4] The trial court also enjoined Duermit from "directly or indirectly using, disclosing, attempting or threatening to disclose, allowing to be disclosed, or assisting any person with obtaining, utilizing, or disclosing any of [Odyssey's] confidential and propriety information (as defined in . . . the Non-Compete Agreement), including any trade secrets." (Appellant's App. p. 21). Finally, the trial court ordered Duermit to "return to [Odyssey] all of its confidential, proprietary, and/or trade secret information he has in his possession, custody, or control" within five business days of the Order. (Appellant's App. p. 21).

[22] Duermit now appeals. Additional facts will be provided as necessary.

---

[4] The trial court enjoined Duermit from engaging in these particular activities for a period of 164 days based on the fact that, at the time Duermit began working for Heart to Heart, "there [were] 164 days left of the [twelve-]month period set forth in the Non-Compete Agreement." (Appellant's App. p. 8). The Non-Compete Agreement specified that the twelve-month restriction of competitive activities "shall be extended by any period for which [Duermit] is in violation of any provision hereof." (Appellant's App. p. 186).

I. *Mootness*

At the outset, we note that the propriety of the preliminary injunction as it pertains to the 164-day enjoinment of Duermit's (1) solicitation of Odyssey's patients, customers, referral sources, and suppliers; (2) his solicitation of Odyssey's employees, consultants, and contractors; and (3) his engagement in competitive business activity within fifty miles of certain Odyssey locations is now moot.[5] The trial court issued its Order on February 13, 2015; therefore, the 164-day period expired on July 27, 2015.

In general, "we decline to address the merits of moot claims unless the matter is of public interest and capable of repetition." *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 171 (Ind. Ct. App. 2008). In his appellate brief, Duermit does not acknowledge the expiration of the enjoinment period and does not proffer an argument as to why the matter should be addressed on its merits. At oral argument, Duermit argued that the matter was not moot because he intended to seek damages based on the erroneous issuance of an injunction. Nevertheless, this court has previously recognized that

> [i]njunctive actions based on noncompetition agreements . . .
> raise some fairly significant policy concerns and are likely to
> recur. Moreover, "full appellate review will often require more
> time than the terms of the noncompetition agreement, so the

---

[5] As the trial court did not establish a time-limit on the enjoinment period regarding Duermit's use and disclosure of Odyssey's proprietary and confidential information, this issue is not moot.

> need for guidance to trial courts in the future dictates that we address" [Duermit's] arguments.

*Id.* (quoting *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 727 (Ind. 2008)).

## II. *Standard of Review for Preliminary Injunction*

The decision to grant or deny a request for a preliminary injunction resides soundly within the discretion of the trial court. *Id.* Thus, our court's review is limited to determining "whether there was a clear abuse of that discretion." *Id.* at 171-72. Additionally, in rendering its decision, the trial court is obligated to issue special findings of fact and conclusions thereon. Ind. Trial Rule 52(A)(1). Following the entry of such findings and conclusions, our role on appeal is ultimately to determine whether the trial court's findings support its judgment. *Gleeson*, 883 N.E.2d at 171-72. Pursuant to Trial Rule 52(A), this court "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." We will find that the trial court's factual findings are clearly erroneous if "the record lacks evidence or reasonable inferences from the evidence to support them." *Gleeson*, 883 N.E.2d at 172. In turn, "[a] judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made." *Id.* We will consider the evidence only in a light most favorable to the trial court's judgment and will "construe findings together liberally in favor of the judgment." *Id.*

In order to succeed on a motion for a preliminary injunction, the moving party—*i.e.*, Odyssey—bears the burden of demonstrating the following by a preponderance of the evidence:

> (1) a reasonable likelihood of success at trial; (2) the remedies at law are inadequate; (3) the threatened injury to the movant outweighs the potential harm to the nonmoving party from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction.

*Id.* If the moving party fails to establish any of these requirements, we will find that the trial court abused its discretion by granting a preliminary injunction. *Id.* We have previously determined that "[t]he power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor." *Id.* (alteration in original).

### III. *Waiver of Restrictive Covenants/Release of Claims*

Although not specifically framed as such, Duermit appears to challenge the issuance of the preliminary injunction on the grounds that Odyssey has failed to demonstrate a "reasonable likelihood of success in this case." *Buffkin v. Glacier Grp.*, 997 N.E.2d 1, 9 (Ind. Ct. App. 2013). Specifically, Duermit claims that Odyssey waived its right to enforce the restrictive covenants set forth in his Non-Compete Agreement, or otherwise released any claims against Duermit,

based upon the terms of the Settlement Agreement reached between Odyssey and Heart to Heart.[6]

[28] The resolution of this issue requires an interpretation of contracts, and, here, both the Non-Compete Agreement and the Settlement Agreement explicitly state that they are governed in accordance with Texas law. When construing a contract under Texas law, "the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983), *reh'g denied*. As under Indiana law, words are to be given their plain meaning, and the entire contract must be examined "in an effort to harmonize and give effect to all the provisions so that none will be rendered meaningless." *TX. C.C., Inc. v. Wilson/Barnes Gen. Contractors, Inc.*, 233 S.W.3d 562, 567 (Tex. App. 2007). "If a contract is worded so that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *R. Conrad Moore & Assocs., Inc. v. Lerma*, 946 S.W.2d 90, 94 (Tex. App. 1997), *reh'g overruled; writ denied*.

[29] In this case, neither party contends that the contracts at issue are ambiguous. *See id*. Nevertheless, "the question of whether an agreement is ambiguous is a question of law, and we may conclude an agreement is ambiguous even if the

---

[6] With the exception of a few citations to Indiana case law regarding the standard of review utilized in contract interpretation, Duermit has not otherwise supported his arguments in this section with citations to relevant authority. Ind. Appellate Rule 46(A)(8)(a). It is only in his reply brief that Duermit provides any citations for his argument regarding the release of Odyssey's claims.

parties do not plead ambiguity or argue the agreement contains an ambiguity."
*McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 888 (Tex. App. 2014) (citing *Coker*, 650 S.W.2d at 394), *review denied*.  If the language "is susceptible to more than one reasonable interpretation, the contract contains an ambiguity and a fact issue exists as to the parties' intent."  *Id.* (citing *Coker*, 650 S.W.2d at 394).

### 1.  *Waiver of Restrictive Covenants*

Duermit does not challenge the reasonableness or enforceability of the Non-Compete Agreement as it is written.  *See Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 771 (Tex. 2011) ("A noncompetition agreement is enforceable if it is reasonable in time, scope and geography and, as a threshold matter, 'if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made.'").  Rather, he claims that Odyssey waived its right to enforce the restrictive covenants contained therein based on the Settlement Agreement between Odyssey and Heart to Heart.  As the trial court found, Heart to Heart hired Duermit under the protocol established by the Settlement Agreement.

Pursuant to the Settlement Agreement, "[u]pon receiving notice of a Party's intent to hire a Principal Employee, the Party receiving notice shall provide . . . a statement whether the Principal Employee is subject to a restrictive covenant and, if so, a copy of any agreement(s) containing such covenant(s)." (Appellant's Conf. App. p. 539).  The trial court found that "Heart to Heart accomplished two (2) goals via this framework:  (1) avoid mass exodus of

employees from one entity to the other; and[] (2) set up a process to obtain the waiver of restrictive covenants prior to employment of current or former [Odyssey] employees." (Appellant's App. p. 10). The Settlement Agreement specified that "[t]he Parties understand and agree that any waiver of a restrictive covenant agreement with respect to a specific individual shall not be deemed a waiver of the restrictive covenant agreement with respect to any other individual, whether or not in the same title or position." (Appellant's Conf. App. p. 539).

[32] In the present case, Heart to Heart notified Odyssey of its intent to hire Duermit as the executive director of its office in Munster, Indiana. In response, Odyssey simply stated, "Your [*sic*] good to go" and noted no concerns with the employment. (Appellant's App. p. 218). According to Duermit, "there would have been no reason for [this] exchange between Odyssey and Heart to Heart if not to ensure that there was no longer a restrictive covenant in place." (Appellant's Br. p. 16).[7] Duermit further insists that, in response to Heart to

---

[7] During the preliminary injunction hearing, both Duermit and Heart to Heart's COO Thurman testified that it was their understanding that by consenting to Duermit's employment with Heart to Heart, Odyssey had fully waived the restrictive covenants in the Non-Compete Agreement. In addition, Duermit claimed that he had never read the Non-Compete Agreement, Confidentiality Agreement, or Severance Agreement and was therefore completely unaware of the terms thereof; rather, he stated that he blindly signed any documents as directed by his employer. However, this testimony directly contradicted the numerous pieces of evidence indicating that both Heart to Heart and Duermit understood that Duermit was subject to the restrictive covenants until a year after his termination from Odyssey—*i.e.*, August 1, 2014. Odyssey *repeatedly* used Duermit's deposition testimony to impeach Duermit regarding his clear knowledge of the terms of his Non-Compete Agreement based on the fact that he had informed his Heart to Heart management team and others about the Non-Compete Agreement and his inability to work in the Indianapolis market for a certain period of time. Moreover, despite Heart to Heart and Duermit's ostensible belief that Odyssey had waived Duermit's restrictive covenants, Heart to Heart stated that it nevertheless instructed Duermit to refrain from

Heart's notice, the Settlement Agreement required Odyssey to "affirmatively disclose the existence of a restrictive covenant and also produce a copy of that covenant." (Appellant's Reply Br. p. 3). By failing to do either of these things, Duermit contends that Odyssey indicated that Duermit "was not covered by a restrictive covenant." (Appellant's Reply Br. p. 3).

[33] On the other hand, Odyssey asserts that its "'good to go' approval of Duermit's employment by Heart to Heart" is insufficient to establish an "actual intent to relinquish its right to enforce the [Non-Compete] Agreement against Duermit." (Appellee's Br. p. 27). While it is well established that "[a]ny contractual right can be waived[,]" a waiver requires the "intentional release, relinquishment, or surrender of a known right." *R. Conrad Moore & Assocs., Inc.*, 946 S.W.2d at 93. The "[i]ntentional relinquishment of a known right can be inferred from intentional conduct which is inconsistent with claiming the contractual right." *Id.* "Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Brannan Paving GP, LLC v. Pavement Markings, Inc.*, 446 S.W.3d 14, 21 (Tex. App. 2013) (quoting *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003)), *review denied*.

[34] According to Odyssey, such intent is absent from the facts of this case as Odyssey's "'good to go' [approval] was induced by [Heart to Heart's] false and

working within fifty miles of the Indianapolis and Avon markets and from soliciting Odyssey employees to work for Heart to Heart until August 1, 2014, as a gesture of "goodwill" toward Odyssey. (Tr. p. 279).

misleading notice of Heart to Heart's intent to hire Duermit." (Appellee's Br. p. 27). In its notice to Odyssey, Heart to Heart specifically acknowledged that Duermit was subject to a twelve-month Non-Compete Agreement, which restricted him from working within a fifty-mile radius of the Indianapolis and Avon offices he managed for Odyssey. As a result, Heart to Heart indicated that Duermit was being hired for a position in Munster—150 miles away from the sites Duermit managed for Odyssey. Therefore, Odyssey posits that its "'approval' of Duermit's employment more than [fifty] miles from Indianapolis was entirely consistent with its intent to reserve the right to enforce Duermit's obligations if he breached them." (Appellee's Br. p. 29). We agree.

[35] We find that a review of the surrounding facts and circumstances does not indicate that Odyssey waived Duermit's restrictive covenants. *See Brannan Paving GP, LLC*, 446 S.W.3d at 21. In its notice of intent to hire Duermit, Heart to Heart essentially informed Odyssey that the scope of Duermit's employment would not violate the terms of his Non-Compete Agreement—*i.e.*, Duermit would be working more than fifty miles from the sites he managed for Odyssey. Furthermore, it is clear that Heart to Heart was aware of the existence of and familiar with the terms of Duermit's Non-Compete Agreement at the time it gave notice to Odyssey. Therefore, any consent Odyssey provided regarding Duermit's hire at Heart to Heart was based on Heart to Heart's representation that Duermit's employment would conform to the terms of the Non-Compete Agreement.

## 2. *Waiver of Right to Sue*

[36] Duermit next claims that Odyssey waived its right to pursue any claims against Duermit by failing to adhere to the following notice-and-cure provision of the Settlement Agreement:

> If either Heart [t]o Heart or Odyssey inadvertently hires a Principal Employee prior to providing the requisite notice, [the hiring Party] shall comply with the notice procedure stated above within a reasonable period of time, but not later than [thirty] days after discovery that the employment of the employee is subject to this Section. <u>Liability shall not be found, and damages shall not be awarded, for breach of [the notification process] if the breaching Party has made a documented effort to cure the breach within [thirty] days of receiving notice of the breach</u>.

(Appellant's Conf. App. p. 539). Duermit insists that, prior to filing a lawsuit, "Odyssey was required to provide notice to Heart to Heart of the perceived breaches of Duermit" and was thereafter "required to provide the opportunity for Heart to Heart to cure any defects in [Duermit's] employment parameters." (Appellant's Br. p. 17). More particularly, Duermit contends that Odyssey failed to notify Heart to Heart "that it felt that [Duermit's] area of operation violated some perceived requirement"; "that it did not agree to a full waiver of [Duermit's] [Non-Compete Agreement]"; and "that it had issues with Duermit's actions after he became employed by Heart to Heart." (Appellant's Br. p. 18). Consequently, Duermit posits that "Odyssey made these decisions and now it must live with the consequences—Odyssey expressly waived its right to sue Duermit without first providing notice and an opportunity to cure any issues." (Appellant's Br. p. 18).

Odyssey, however, argues that when the entire provision is read in context, the notice-and-cure provision "plainly governs only disputes between Odyssey and Heart to Heart over the inadvertent hire of Principal Employees." (Appellee's Br. p. 34). Again, we agree. In this case, Heart to Heart was aware of Duermit's status as a former Odyssey employee, and it provided Odyssey with notice of its intent to hire Duermit as contemplated by the Settlement Agreement. Thus, this is not a situation of an "inadvertent[] hire." (Appellant's Conf. App. p. 539). Under Texas contract law, "courts must consider the entire writing and give effect to all provisions of the contract within the context of the entire agreement so that no provision is either rendered meaningless *or given dispositive effect in isolation.*" *Hayes v. Wells Fargo Bank, N.A.*, No. 01-06-00720-CV, 2007 WL 3038043, at *2 (Tex. App. Oct. 18, 2007) (emphasis added), *cert. denied*, 555 U.S. 1012 (2008). As noted by Odyssey, the provision at issue makes no reference to disputes between Odyssey and Heart to Heart regarding the non-competition agreements of former employees; rather, the plain language of the notice-and-cure provision establishes that it applies only in situations where one entity inadvertently hires a former employee of the other without providing the requisite notice. Accordingly, Odyssey has not waived its right to pursue a lawsuit against Duermit by failing to adhere to the notice-and-cure provision. Instead, we agree with the trial court that Odyssey

satisfied its burden of demonstrating a reasonable likelihood of success on the merits because Duermit breached the terms of his Non-Compete Agreement.[8]

#### IV. *Threatened Injury to Odyssey Versus Potential Harm to Duermit*

Lastly, Duermit claims that the trial court abused its discretion in granting the preliminary injunction because "Odyssey failed to introduce any evidence that it would suffer further harm if the preliminary injunction was not entered." (Appellant's Br. p. 20). In order to merit a preliminary injunction, the moving party must establish, in part, that the "remedies at law [are] inadequate, thus causing irreparable harm pending resolution of the substantive action" and that "the threatened injury to [the moving party] outweigh[s] the potential harm to the [non-moving party] resulting from the granting of an injunction." *Curley v. Lake Cnty. Bd. of Elections & Registration*, 896 N.E.2d 24, 32 (Ind. Ct. App. 2008), *trans. denied*. Here, the trial court specifically found that "[t]he harm [Odyssey] would suffer if a preliminary injunction were denied exceeds the harm Duermit would suffer if it were granted." (Appellant's App. p. 20).

Duermit posits that "[t]he evidence that Odyssey presented—retention and disclosure of 'confidential' documents; contact with Odyssey referral sources;

---

[8] Duermit also claims that Odyssey released any claims regarding his retention of Odyssey's confidential documents based on the Mutual Release of Claims provision set forth in the Settlement Agreement. However, as Odyssey points out, Duermit has not argued that the Mutual Release released Odyssey's claims arising from Duermit's breach of the non-solicitation/non-competition provisions of the Non-Compete Agreement. Because Odyssey has established a reasonable likelihood of succeeding on the merits at trial as to Duermit's violation of the Non-Compete Agreement, we need not address Duermit's contention. For the same reason, we need not address Duermit's claim that Odyssey is not entitled to a preliminary injunction because Odyssey failed to meet the minimum requirements to establish a claim under the Indiana Uniform Trade Secrets Act.

and communications with Odyssey employees—was all in the past. . . . Odyssey did not introduce direct or circumstantial evidence that [Duermit] threatened to further injure Odyssey after August 19, 2014 (the date the lawsuit was filed)." (Appellant's Br. pp. 20-22). He therefore argues that the injunction was inappropriate because "[m]onetary damages awarded after the trial [would be] an adequate remedy for those alleged misdeeds." (Appellant's Br. p. 21). It is well established that "a party that suffers mere economic injury is not entitled to injunctive relief because an award of post-trial damages is sufficient to make the party whole." *Barlow v. Sipes*, 744 N.E.2d 1, 6 (Ind. Ct. App. 2001), *trans. denied*. It is the trial court's "duty to determine whether the legal remedy is as full and adequate as the equitable remedy." *Id.*

[40] Contrary to Duermit's assertion that the trial court erred because its "judgment contains no factual determinations regarding the balancing of the harms, just a bare bones recitation of the element[,]" the trial court made numerous unchallenged findings regarding Duermit's ongoing violations of his Non-Compete Agreement and the Indiana Uniform Trade Secrets Act to support its conclusion. (Appellant's App. p. 21). Specifically, the trial court found that Odyssey "has a legally protectable interest in maintaining the secrecy of its confidential information and trade secrets and ensuring that the information is not used by a former employee to compete" as well as "in the business advantage created by the personal relationships Duermit had with [Odyssey's] referral sources" and "the personal relationships Duermit had with [Odyssey's] employees and in maintaining a stable workforce." (Appellant's App. pp. 16-

17). Accordingly, the trial court concluded that Duermit "has violated, and threatens to continue to violate," the non-solicitation and non-disclosure restrictions set forth in his Non-Compete Agreement, and that he "has violated, and threatens to continue to violate[,]" Texas common law and the Indiana Uniform Trade Secrets Act by misappropriating Odyssey's confidential information. (Appellant's App. pp. 18-19).

[41] The evidence further establishes that, as of the date of the preliminary injunction hearing, Duermit "still had not returned Odyssey's proprietary documents." (Appellee's Br. p. 48). In addition, Odyssey remarks that the trial court noted no evidence that Duermit would be harmed in *any* manner by the preliminary injunction; in fact, "the trial court allowed him to continue to earn a living as an employee of Heart to Heart, as long as he operated more than [fifty] miles from Indianapolis and did not attempt to raid Odyssey's employees or referral sources or to use or disclose Odyssey's proprietary and trade-secret information." (Appellee's Br. p. 50). Thus, we cannot say that the trial court erred in determining that "these continuing breaches will cause or threaten to cause irreparable harm and damage to [Odyssey] unless Duermit is enjoined." (Appellant's App. p. 19).

## CONCLUSION

[42] Based on the foregoing, we conclude that the trial court acted within its discretion in issuing the preliminary injunction.

[43] Affirmed.

Najam, J. and Robb, J. concur